Good morning. May it please the court, Christopher Cataldo for the appellants. We have two computer-related issues for the panel that arise in a sale of business context. The first one I'd like to talk about is the Stored Communications Act and specifically subpart two of the statute that prohibits intentional access or, I'm sorry, intentionally exceeding an authorization to access a facility is the language. So the context this comes up in is important. We have the seller sells the assets of this restaurant group to my clients who are the buyers, which includes the domain and is supposed to include the domain and licenses and the entire business. As part of the transaction, there was an, I would describe as an informal arrangement whereby Mr. Massey, whose name you probably read 20 times in the briefs, who was employed as the IT administrator for the seller, stayed on in a capacity and helped the buyer with respect to IT issues as well. He served in an informal capacity as the buyer's IT director as well. How long did this last where you kind of had a deal and then eventually it fell apart? Four months, six months? So the deal closed in January 1st of 2019. And by mid-July of 2019, I don't know if the deal falling apart is the right terminology, Mr. Moore had said to the seller, Mr. Dixon, you're in breach. You didn't deliver all the assets. I'm tendering them back to you. Mr. Dixon says, I'm not taking them back. You keep all the assets. And so it was about a six-month period where Mr. Massey is then working as the IT administrator through this informal arrangement for the buyer. And for both companies? Or both sets of companies? Yes. He's on both sets. He's serving two masters. I got it. Right. Fast forward, get into litigation between Kamala Busu's Mr. Dixon in state court in Michigan. And Mr. Dixon directs Mr. Massey, who still had his access as the administrator, to go into Mr. Moore's emails. And they're trying to hunt up evidence that they can use in the state court case. And what he told us how he actually did it when we took his deposition, he went in and changed – he actually said he couldn't remember exactly how he did it. It was one of two ways. He actually changed the password on Mr. Moore's email. He had been password protected. Or alternatively, he just added himself as an authorized user to Mr. Moore's email account. Therefore, he was able to add a search engine tool and ran the search engine tool and came up with hundreds, if not thousands, of his emails. So just out of curiosity, so he clearly has – he's not intentionally exceeding authorization during that first, we'll call it six-month period. You seem to be talking about later, right? This happens later, yes. Okay, so just out of curiosity, why wasn't there a decision to say by July, you know, we're not really enjoying each other's company here. Massey should not have access to this other set. I mean, that just seems like a kind of – what am I missing in terms of why that wasn't an obvious thing to do? So what Mr. Moore did was send kind of a mass email out to everyone, basically letting go all of the employees. It wasn't directed just to Mr. Massey. We believe that was effectively an implied termination of his position as administrator, but he still held those functions. And yes, Mr. Moore did not go in and turn off his access. Well, that's what I'm not getting. I mean, you have the Supreme Court decision, which doesn't really care about state of mind. It just cares about whether your access has been turned on or off. Well, you know, respectfully, that gets us into the issue that we've been talking about in Judge Parker's ruling, which was to the extent he has authorization, then he has permission consent. And if you think about this in the context of every business – I'm sure the court has an IT administrator. Every business has an IT administrator that has access and can access emails and change passwords and do whatever administrators do. And essentially the rule of the trial court now is – or the district court – is that all of those administrators, because they have the ability to take all of their clients' and customers' data and emails, that means they have the authorization to take them and disseminate them to third parties. Well, part of it – I mean, you know, it doesn't warm my heart. I'm with you on that. But part of it is the statute, you know, says intentionally exceeds authorization is kind of issue one. And then issue two is the Supreme Court's decision that if you're not intentionally exceeding authorization, we frankly don't care why you're doing what you're doing. Because the facts of that case were probably worse than this one in terms of what the officer was doing with the information. So we think those are questions of fact that the jury should have been allowed to decide and should not have been decided on summary judgment. Those being what? Well, look at the context of this. Is that Mr. Dixon sells these assets, including this domain, to my client. And then says I'm going to access it through this back door to get his emails, get a cut around his password that I can use against him. And you don't believe there's at least an implied restriction on an IT administrator for every business and company that you're not going to take – But if it's implied, how would he intentionally exceed authorization? That the administrator would know. You don't think the court's administrator doesn't know that he can't take your private emails and disseminate them to the public? But if he has the key – I mean, it's just like a house. You buy the house, you sell the house, and you as the seller intentionally let – or the buyer lets the seller keep the key. And we have cited – Go for it. Keep the key. How can you then say when they use the key you intentionally exceeded authorization? It's bad morals, bad ethics, invasion of privacy, et cetera. But how is it intentionally exceeding authorization when you're allowed to keep the key? Because his authorization was after the sale, only to use that to assist Colin Abu, the buyer. I thought you started off addressing the FCA. Yes. The FCA talks about a facility. Yes. Do you see a difference between the two statutes? Well, I mean, there is language difference, but under the FCA, the facility, I believe, is the Microsoft stored email, which is accessed through the domain, and these licenses that connect to it. I think that is the facility that is referenced under the FCA. But, okay, you said Moore sent out a letter. He did. It was an email. What? An email. An email, and he discharged everybody? His employees, because when he handed the restaurant keys back to Mr. Dixon and said, you are in breach. You have not delivered me sufficient assets. I want my money back. Okay, and that was in July? Correct. Okay, and are you saying that after that point, there was no communication between Moore or anyone who worked for him and Massey? I believe after that, Mr. Massey sent out some type of an email saying he was going to close down the Epicurean Group email account, and I believe that is referenced in the Applebee's brief. There was a communication from him. So, but you are asserting as a factual matter that that letter effectively removed any authorization that Massey had with respect to the Epicurean Group? Yes. I mean, he should have known at that point his duties as administrator or rights as administrator of Epicurean Group were over, and that there was no further need for him to do anything with respect to those roles to help the Epicurean Group. And after that point, he was doing it solely to benefit Mr. Dixon, who was the seller in the transaction, and looking for, you know, trying to go through Mr. Moore's emails to get evidence to use against him. Okay. So, and in terms of authorization and, you know, intentionally exceeding authorization or intentionally going in without authorization, are we to look at Massey or at Dixon? Interesting point. We did not sue Mr. Massey. He is not named as a defendant. I'm sorry, what? We did not name Mr. Massey as a defendant. He's a low-level IT guy. Okay, so he was doing the bidding of Mr. Dixon. He acted under Mr. Dixon's direction and his employer, which was Dixon and Associates, because he needed, you know, obviously had to keep his job, and he did what he was told. We should be looking at whether Dixon intentionally used his agent to get what he was intended to get. Exactly, exactly. Dixon was the agent. Can I just, on that point, doesn't that complicate things? It seems a lot harder. Like, I'm imagining me being Dixon, not in the ethics sense, but, like, I don't know how this works. Like, doesn't that make your burden harder in terms of showing intentionally exceeding authorization? The reality is Dixon said to his IT guy, go get me Moore's emails, and left it to Mr. Massey to figure out how to get through and around his password to do it. Or that shows he thought they still had authorization at his clueless level of understanding. It shows he had ability, but, again, I come back to the same point, which is, you know, that I said a moment ago. Maybe your IT director has the ability to get all of your emails, but is he free to just, he or she, send them to me, put them in the newspaper tomorrow, because he has the ability to do it. And that's the problem is there are a lot of good Eighth Circuit cases. The Sixth Circuit hasn't actually. Does it matter that throughout all of this, even when it looked like the sale was going to take, that the domain name belonged to Dixon and his entities? So the trial court said that was irrelevant. Our position on that issue was that was included in the assets that were supposed to have been conveyed to us, that it was up to the seller, because they were in control of that. They had to go to the domain and change it, and they didn't do it. They were supposed to have done it, and we paid for that asset. So, you know, it was clearly our position that we owned the domain, and that was the intent of that contract. And I'll say further that in the state court case, and this is outside the record, Mr. Dixon won on at least one of the issues where he prevailed, saying these, all of these assets that are referenced in this purchase agreement, regardless of formality, were conveyed to the buyers and knocked out one of our counts in the state court case on that basis. All right. You started this by saying you're outside the record. No. That's outside the record. You're past the time, so that's an even worse time to go outside the record. Of course, maybe that doesn't count. But I want to make sure I understood an earlier answer. You wanted to start with one of the statutes, but as I understand your theory of the case, it really doesn't differ between the statutes. I mean, if we focus on intentionally exceeds authorization, that language is the key language in both statutes. So am I right in thinking your theory of liability applies equally to both statutes when it comes to this argument? Yes, it does. But on that issue, meaning the Computer Fraud and Abuse Act, the district court did not reach any of that. I mean, she had previously in a prior summary ruling said you've satisfied the elements there. But on this ruling, it was only relating to that $5,000 threshold. And she didn't mention any other issue. I got that we have a lot of different ways to look at the case. So you'll get your full rebuttal. Let's hear from the other side.  And thank you very much. Good morning. May it please the Court. Philip DeRozier appearing on behalf of the defendant's appellees, Mr. Stanley Dixon and Dixon and Associates. So I think I'm going to take my cue from the discussion and just kind of get right into this notion of the mens rea. I mean, I do think that it cuts through the entire case, put a pin in loss and, you know, see if it's necessary to get there. It's obviously very extensively briefed. Although the district court did rely for purposes of the Computer Fraud and Abuse Act claim on the court's determination that loss wasn't shown, there wasn't evidence of compensable loss, and did earlier deny summary judgment, finding questions of fact on authorization and intent. Of course, that was early in the case. Things changed. And the court did an entire analysis under the SCA of authorization. Two questions. If you intentionally, your argument is if you intentionally, you must intentionally exceed authorization. Correct. Correct? If you do so, aren't you acting in bad faith? Would you agree? If you intentionally, if you know you lack authorization and you act intentionally to exceed it, are you acting in bad faith? That makes sense to me. I mean, it's certainly a violation of the statute if you intentionally exceed your authorization. So if you don't intentionally exceed your authorization, so you're, sorry, that's a bad way to start. There's, in the Stored Communications Act, there's a good faith defense. How is that not superfluous under your understanding? Because if you don't, let me put it this way, the Stored Communication Act has as a threshold requirement and also does the Computer Fraud and Abuse Act, the requirement that access be done, let's talk first about the SCA, done with a knowing or intentional state of mind. The Computer Fraud and Abuse Act requires similarly intentional authorized access. But if intentionally exceeds authorization, you're doing it knowing you don't have authorization, how does the good faith defense ever come in if that is the requirement? Well, because I suppose in a hypothetical situation, there could be one where someone, so you meet that initial element. You exceed your authority intentionally, knowingly. You knew you weren't supposed to access the facility or the computer and you did it anyway. There may be a situation where there could be then that's where the defense could come in. There might be a reason why you felt nevertheless justified in doing it. Now, whether that is a good enough explanation, but again, that's not, we don't need to rely on that here because there was no evidence in our view, and as the district court concluded, that either Mr. Dixon or Dixon and Associates' company, that the defendants were aware, knew, acted intentionally without having. How does it work? I mean, I know it was implied that Massey wouldn't keep doing this, but how would it have worked if, you know, there's actually something that says, you know, your IT person cannot access this anymore. Massey signs it, Dixon signs it, but they still technically have the key because whatever. On the conless side of the deal, they don't realize quite what they've already done in terms of access. How does it work there? So in my case, it's not implied that they've actually agreed not to look at their emails anymore, but the reality is they still have access, and we'll even call it Conlon's fault. They didn't shut it down as they could have. How would it work in terms of intentionally exceeding authorization? So they have the key, but they've been directed not to use the key. Well, I think that would certainly present a much harder case. I mean, that could be a different situation where there, because, of course, we know that there is some manner of, or a lot of manner of disagreement about who should have held the key, who properly held the key, you know, did ownership transfer, did it not. The reality, though, here is that ownership did not transfer. The entire time that these events were going on, Mr. Massey was the administrator of the accounts. All of the fees. What happened exactly in July, not exactly, but relevant to this point? Sure. So that was when, as Brother Counsel explained, that was when, I'll call it the deal fell apart, but, you know, in a loose sense. I mean, there was a whole state court litigation on that. But it was in that July timeframe when things with the businesses that were in the process of being sold, they weren't going as Mr. Moore expected. So he sent the letter tendering back all of the assets. And then as it was apparent at the time that this was going to lead to, you know, to a dispute, that July timeframe was when then Mr. Dixon instructed Mr. Massey, concerned, you know, I think about whether emails would still be there, wanted him to go in and get the emails and preserve that evidence. I think that's how it was explained. So it happened in July, not later in the fall? This was at the end of July. No, I apologize, Your Honor. The end of August was when the access took place. So this was a, it was a rolling set of events that extended into the end of the summer. I apologize. When I was saying end of July, I should have said the end of August. That was when the access of the emails took place. That was when, also when Mr. Massey sent the communication to the Epicurean Group employees, notifying them that the, you know, that their accounts were going to be deactivated. It was in that timeframe is when the, you know, deal was falling apart. So why isn't it appropriate to say it doesn't matter that technically they still have access because the IT expert Massey is a genius? If they have a communication that says deal done or whatever, you no longer have a right to look at our emails, why isn't that all you need for a claim? I'm not saying that happened here. I'm just trying to figure out how this works. And I guess I have an intuition that that kind of communication, even if you didn't perfect it by pulling every plug or whatever it is you would try to do to shut down access from Massey to the Conlon Group, why isn't a contract enough? Well, I think, I mean, I think it comes, I do think it comes down to, I mean, to the evidence. Like here there was no... I'm just saying why in the abstract? Well, yeah, in the abstract if there was some specific effort made and it was, you know, it was directed... And it could be unilateral. I mean, shouldn't Conlon be able to say, listen, I realize we've been working together for four, six months and hope springs eternal, it didn't work out. But if you access any of our stuff from here on you have... Well, I won't concede that it was unilateral. Why can't it, no, I'm saying why in the abstract can't it be unilateral? Don't come to my house, don't look at my emails. Well, because if these email accounts, if the facility or the computer, so the facility in the case of the SCA, the computer system in the case of the CFAA, if it is owned, if it's undisputed that those accounts are controlled, they're owned, these are my accounts and you have emails housed within them and you tell me that I can't access those emails, that doesn't speak to these statutes. If I am still, if this is my facility, this is my email account, this is my computer system that houses all of this, I guess I wouldn't concede that someone could unilaterally say you can't look at my emails. Now, if that happens, there may be some other claim, I don't know, but these are very specific statutes that we're dealing with here. These relate to unauthorized and done in a way that's intentional, intentionally exceeding authorization. Your argument is that if you ownership, the owner always is authorized under these laws to access emails. That would be my position unless there's some reason why that ownership is in question. So the follow-up to that is unless ownership is in dispute, there's no issue here. That's your position, right? Well, I think in order for the authorization to be exceeded, I think somebody would have to be determined. It all comes down to the authority, right? And authority, you can have authority in a lot of different ways. If you own the accounts because you pay the fees and they don't belong to anybody else, maybe there's a way to dispute that. All I'm saying is that if there's a dispute over ownership, then I think you just have to look at a different set of circumstances to determine whether a particular access was or wasn't authorized because maybe you're no longer relying solely on the ownership. Maybe it's implied consent. But I think what's honestly— What are you relying on? Well, what we are relying on here is, it is our position that these accounts were owned still at the time by the defendants. They certainly were. There's no dispute about the extent of the control over the accounts throughout, from beginning to end. These accounts were never controlled. The fees were never paid by anyone other than the defendants. And Mr. Massey was always in control of the accounts. Go ahead. Were you reimbursed? I thought I read someplace that you were reimbursed. So, I will acknowledge that the parties disagree about the extent, about whether in the extent of reimbursement and whether the reimbursement— There were bills sent. The record does reflect invoices were sent for these fees. Whether they were paid is not clear. And also, when that stopped. To the extent that they were paid or invoices were sent, when that stopped. It sounds like there was also a question of ownership. Because somebody— I mean, somebody can have the beneficial ownership or something, or have ownership under the document, the sale document, and, you know, the other party just not deliver it. Yes, no, I think that's right. But what I—so that's why I think, you know, I kind of started this way. And this is where I think we end up at what is, I think, a pretty straightforward answer to all this. I don't rely—we don't rely just on the defendants having an ownership right. I mean, we think that they did and that that was the authorization. We also think that there was, you know, there's this notion of consent. Because, again, all throughout, the plaintiffs knew that these accounts were controlled, were accessed. You know, the Microsoft permissions alluded to in the briefing explain that, you know, if you are part of an organization and that organization administers the accounts, then, you know, they can read the emails. So there is all of the evidence that we did discuss in our briefs that we do believe gave defendants authorization. But the crux of this, we think, is it comes down to the mens rea. It comes down to the requirement that if there's exceeding of authorization, it has to be done intentionally. And that, we—there's no evidence of that here. Okay. That just looks at Massey. But we're talking about Dixon. You don't think that there's a question of fact from the jury on whether he understood, when he directed Massey to go looking through their accounts, that he was now in a dispute with them and they had attempted to sever the relationship, sent a letter out, and no question of fact whether he understood he was no longer authorized to look into Condon's email? I don't think there's a—well, that's a—you know, that's a—whether he was or wasn't authorized. What I'm talking about is did he—what did Mr. Dixon think? No, I don't think there is any evidence creating a question of fact. Any evidence from which a jury could look at this record and say that—  Excuse me? What evidence would be sufficient? That some evidence that Mr. Dixon knew or that he knew that he didn't have authorization anymore and that he did it anyway. That's—I mean, that's what these statutes are here for. And that's the evidence that's lacking. He thought he owned these accounts. I mean, I think my brother counsel even alluded to it. He—and this is, you know, this is not— again, this is part of the problem is we're dealing in speculation because this isn't in the record. If ownership was in dispute, you'd still be arguing you win. We still win because of the lack of intent. That's really the bottom line. And that's how the district court really concluded its opinion is that, look, no matter what you make of any of the other issues, there is no evidence that whether they were authorized or not, there's no evidence that whether you talk about Mr. Massey or Mr. Dixon, there's no evidence that they, you know, knowingly and intentionally exceeded authorization or acted without authorization. Mr. Dixon thought that these were his email accounts. Right or wrong, he thought these were his email accounts. And so we told Mr. Massey to go and pull the emails from them. But we also have emails from Moore's private account. Is that true? So, yes, but let me explain kind of how that worked and what the evidence on that showed. So as Mr. Massey testified, he was not entirely sure how these emails from Mr. Moore's personal emails kind of came into the search that he ran because he testified he only accessed the Epicurean group domain, the licenses, the accounts that, you know, he and Mr. Dixon believed were their accounts or Mr. Dixon's accounts. So these emails, this is where Defendant's Expert comes in, issued a report. The report explained that when you're dealing with these Outlook, Microsoft Outlook accounts, if you create a calendar entry, you can attach emails to those calendar entries. Those emails are from outside, but you as interacting, so here Mr. Moore interacting with the Microsoft Access calendar application, the explanation is that the only explanation for how those got cropped in was because they were attached as calendar items. There was no evidence that there was any intent on behalf of either Mr. Massey or Dixon or any evidence that they did get into Mr. Moore's personal email accounts. These emails appeared as calendar entries. That's the only explanation in the record that came from the Defendant's Expert. The Plaintiff's Expert issued a report and said, well, that's not correct. That's funk. I forget the words, but no explanation for why the Defendant's Expert's explanation wasn't correct. No alternative explanation offered, so that's the story about the personal email. Again, it comes down to no, neither Mr. Dixon or Mr. Massey got into any of these emails, didn't get into the Microsoft Outlook accounts that housed these email accounts, knowing that they didn't have authority. They thought they did, and that's where we think we win. All right. Thank you very much. Thank you. Appreciate it. Mr. Dixon's testimony was that he understood these accounts had all been part of the asset purchase agreement and conveyed to my client. We quoted that testimony or cited it in our brief. That's not consistent with what was said, and that would have been totally inconsistent with the positions he was taking in the state court case, which is everything went to you. Whether every I or T was dotted, it all was yours, and you've got to pay me the balance of what you owe. That was part of that. So the idea that he acknowledged that he still owned these accounts is completely inconsistent with that position in his deposition testimony. Two, with respect to the personal emails, when we deposed Mr. Massey and asked him, how did you get, I mean, it's one thing to get the Epicurean group, which was the domain for the business, but he had all these other, and he couldn't tell us, and they actually, his partner objected, saying this was speculation to ask Mr. Massey. Well, you just heard the other evidence. What's your reaction to what he's saying? Well, what their expert did, he did not do a forensic analysis of the computer system. All he did, he looked at the emails, and he had a theory that it must be because they were linked to the outlook that when they searched the Epicurean group, it would have pulled them in. That was a theory. He didn't have any really evidence of that. Our expert looked at that and said that wouldn't work, that that's not an explanation for how it would happen, and we know they got the personal emails. Including the calendar point. Pardon me? Including the calendar point. Yes, exactly. So when I was hearing Brother Counsel talk, an analogy jumped into my mind, and maybe this won't be a good one, but let's suppose I've got a safety deposit box, and it's mine, okay? And I leave the key, by mistake, right here on the counter, and I go off, and somebody comes along and picks it up, and they go and take my stuff. I gave them the key to do it. I left it here. I didn't mean to. I didn't intend to, but they did. Now, is that wrong or improper? Because that's kind of what they're saying. It's sort of a gotcha, which is you own these accounts. They're yours. This domain is yours. These are your emails in there. You didn't send them to us. You sent these out to third parties. But, you know, ha-ha, we had a backdoor in that you didn't think about, which is kind of exactly like that case that we cited to the court in our brief, where the lady had turned in her BlackBerry, not realizing it had a link to all of her Gmail accounts, and the court said, no, they have a ‑‑ she's got a claim. Just because you gave somebody the keys to the castle, so to speak, doesn't mean they have permission to go in and take your stuff using those keys, and that's the point we've been trying to make, and we think that there's some good cases, actually in the Eighth Circuit, that are right on point and speak on that issue. And so I thank the court for your time. And you have a beautiful courthouse here. Can I just add that? I know I'm over my time. It's gorgeous. Well, I wish we could take credit for it. We're visiting in the same way you are. But thank you very much for your helpful briefs and arguments. It's a tricky, interesting case, so it's great to have good lawyers. So thank you very much. Thank you. All right. The case can be submitted, and the clerk may adjourn the court. The court is now adjourned.